**UNITED STATES of America, Plaintiff,**

v.

**SOUTHERN MOTOR CARRIERS RATE CONFERENCE, INC., Motor Carriers Traffic Association, Inc., North Carolina Motor Carriers Assoc., Inc., National Association of Regulatory Utility Commissioners, Defendants.**

Civ. A. No. 76–1909A.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 20, 1979.

472

Robert M. Silverman, Robert N. Dempsey, Judy L. Goldstein, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., Joen Grant, Washington, D. C., William L. Harper, U. S. Atty., Atlanta, Ga., Paul Rodgers, Nat. Ass'n of Regulatory Utility Comm'rs, Washington, D. C., for plaintiff.

J. Raymond Clark, L. C. Warren, Washington, D. C., for Motor Carriers Traffic Ass'n, Inc.

Allen I. Hirsch, Ellis Arnall, Arnall, Golden & Gregory, Atlanta, Ga., for Southern Motor Carriers Rate Conference, Inc.; Homer S. Carpenter, Rice, Carpenter & Carraway, Washington, D. C., of counsel.

Charles L. Gowen, King & Spalding, Chas. Shaffer, Jr., Michael Eric Ross, Atlanta, Ga., for N. C. Motor Carriers Ass'n, Inc.

Alabama Service Commission, Susan Beth Farmer, Asst. Atty. Gen., Montgomery, Ala., Georgia Public Service Commission, R. Douglas Lackey, Asst. Atty. Gen., Atlanta, Ga., Tennessee Public Service Commission, William C. Koch, Jr., Deputy Atty. Gen., Nashville, Tenn., Eugene W. Ward, Gen. Counsel, Tennessee Public Service Commission, Nashville, Tenn., Mississippi Public Service Comm., Bennett E. Smith, Jackson, Miss., North Carolina Utilities Commission, Maurice W. Horne, Deputy Gen. Counsel, Utilities Commission, Raleigh, N. C., David H. Coburn, Counsel for NMFTA, Rea, Cross & Auchincloss, Washington, D. C., Paul Rodgers, Charles A. Schneider, William R.

Nusbaum, Washington, D. C., John Wallace, Asst. Atty. Gen., Raleigh, N. C., Homer S. Carpenter, Arlington, Va., Charles D. Gray, Deputy Asst. Gen. Counsel, National Assn. of Regulatory Utility Commissioners, Washington, D. C., for amicus curiae.

## ORDER

RICHARD C. FREEMAN, District Judge.

On November 17, 1976 the United States filed a complaint under Section 4 of the Sherman Act, 15 U.S.C. § 4,[1] to enjoin the continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[2] The three rate bureau defendants, Southern Motor Carriers Rate Conference, Inc. ("SMCRC"), Motor Carriers Traffic Association, Inc. ("MCTA"), and North Carolina Motor Carriers Association, Inc. ("NCMCA"), represent common carriers before the regulatory commissions of the States of Alabama, Georgia, Mississippi, North Carolina, and Tennessee. On behalf of their members, the defendants publish tariffs containing proposed rates for intrastate for-hire transportation of general commodities. The complaint alleges that the defendants and their co-conspirators have engaged in a continuing conspiracy to fix these rates within the five subject states. The parties completed discovery following the court's ruling, on July 4, 1977, on the defendants' motions to dismiss the complaint and the plaintiff's motion to strike certain affirmative defenses. *United States v. Southern Motor Carriers Rate Conference, Inc.*, 439 F.Supp. 29 (N.D.Ga. 1977). As a part of that order, we invited the Attorneys General of the States of Alabama, Georgia, Mississippi, Tennessee and North Carolina "to participate in the instant action by filing briefs, memoranda, or evidence which may be a critical aid in the ultimate resolution of the issues presented . . . ." *Id.* at 52. The action is presently before the court on the parties' cross-motions for summary judgment, Rule 56, Fed.R.Civ.P. For the reasons set forth below, we GRANT the government's motion for summary judgment and DENY the summary judgment motions filed by the defendants.

Discovery in this action has led to the development of a substantial record. While the parties vigorously dispute the significance of the facts in the record, they do not dispute the facts themselves, and have filed extensive stipulations of fact. The statement of the case which follows will review first, the regulatory schemes in the five subject states; second, the operations of the defendants in formulating and publishing intrastate rates before the state commissions; and finally, the procedures followed by the commissions in reviewing the proposed rates. The regulatory schemes of the various states differ somewhat, and we will survey each separately. As the rate formulation practices are similar among the defendant conferences, and as the review mechanisms are similar among the commissions, we will describe these by reference to the North Carolina example. To the extent that there is a dispute among the parties, we will of course view the facts in a light most favorable to the defendants. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

## THE STATE REGULATORY SCHEMES

*Alabama* —Under Alabama law, all non-exempted motor carriers are subject "to control, supervision and regulation by the

---

1. Section 4 of the Sherman Act, 15 U.S.C. § 4, provides in pertinent part:

   The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. . . .

2. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in relevant part:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . .

[Alabama Public Service] Commission." Title 48, Ala.Code § 301(3). That authority includes regulation of intrastate commerce "except insofar as the same may be in conflict with the provisions of the constitution of the United States and the acts of congress" in force in 1940 or thereafter enacted. Title 48, Ala.Code § 301(4). The powers and duties of the Alabama Public Service Commission are set forth in Title 48, Ala.Code § 301(5), and include:

> 1. [The duty] [t]o regulate common carriers by motor vehicle as provided in this article and to that end the commission may establish reasonable rules and requirements with respect to adequate service, transportation of passengers, baggage, freight and express, . . .

> . . . . .

> 4. To supervise and regulate common carrier in all matters affecting the relationship between such common carriers and the traveling and shipping public.

. . .

Alabama Code § 301(17) further places concomitant duties on the common carriers with respect to rates, fares, and charges, including, *inter alia:*

> B. . . . the duty of every common carrier of property by motor vehicle to provide safe and adequate service, equipment and facilities for the intrastate transportation of property in the State of Alabama; to establish, observe and enforce just and reasonable rates, charges and classifications, and just and reasonable regulations and practices relating thereto . . . [for] all . . . matters relating to or connected with the intrastate transportation of property in the State of Alabama.

> C. Common carriers of property by motor vehicle may establish reasonable through routes and joint rates, charges and classifications with other such carriers or with common carriers by railroad or express or water; . . . In case of such joint rates, fares or charges, it shall be the duty of the carrier parties thereto to establish just and reasonable regulations and practices . . . .[3]

These provisions illustrate a common pattern among the subject states: motor carriers are required to cooperate for the limited purpose of establishing joint rates, i. e., rates covering a shipment in which one carrier operates over only part of the route and another carrier serves the remainder. In this fashion, a shipper is able to obtain a single price for a shipment involving more than one carrier. On the other hand, Alabama does not require that two carriers providing identical service along the *same* route charge identical prices, or confer as to the prices each will charge.

*Georgia*—Motor common carriers came under the jurisdiction of the Georgia Public Service Commission in 1929. Pursuant to the requirements of the Georgia statutes all common carriers must obtain certificates of public convenience and necessity. The Public Service Commission has the sole authority to prescribe just and reasonable rates, fares and charges. The Commission maintains a staff of seven professionals and additional clerical personnel to analyze motor common carrier costs of Class "A" carriers.[4] As in Alabama, Georgia law sanctions cooperation between motor carriers in establishing through routes at prescribed joint rates. The statutory framework requires that the Georgia Public Service Commission

> prescribe just and reasonable rates, fares, and charges for transportation by motor

---

**3.** Interstate Commerce Tariff Circular No. 3 provides, "The term joint rate means a rate that applies over the lines or routes of two or more carriers. . . ." Horace F. Hartley, Director of Transportation Rates and Services, Georgia Public Service Commission, described a *joint rate* as a rate derived *by two or more* carriers to cover a single interlining movement of freight in which those carriers participate. Deposition of Horace F. Hartley at 61–62.

**4.** Rule 2 of the Rules and Regulations defines Class A carriers as:

> common carriers of passengers and/or property operating over a fixed route or between fixed termini in intrastate and interstate commerce, under Certificates of Public Convenience and Necessity.

common carriers of passengers, baggage and property, and for all services rendered by motor common carriers in connection therewith, and the tariffs therefor shall be in such form, and shall be filed and published in such manner and on such notice as the commission may prescribe, and shall be subject to change on such notice and in such manner as the commission may prescribe.

Ga.Code Ann. § 68–613. Rule 10(a), General Motor Carrier Rules and Regulations of the Georgia Public Service Commission provides that

Motor carriers of property operating under certificates Class 'A' will be required to receive property destined to stations located on routes of other Class 'A' carriers, and to interchange such property at rates prescribed by this Commission, with such connecting carriers.

*Mississippi*—The regulation of motor common carriers operating in intrastate commerce within Mississippi was vested in the Mississippi Public Service Commission by the Motor Carrier Regulatory Act of 1938. The public policy expressed by the 1938 Act substantially paraphrases the National Transportation Policy, *see* 49 U.S.C. preceding §§ 1, 301, 901 and 1001, and provides that the purpose of the regulation of motor common carriers is to ensure "reasonable charges . . . without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices . . . ."

Mississippi law comes the closest to requiring uniform rates to be charged by competing carriers serving the same route. Rule 39d(4) of the Mississippi Public Service Commission provides:

Where two or more freight rates are published to apply on certain articles or commodities between points in Mississippi, by the same motor carriers, or by different motor carriers, the lowest rate, whether class or commodity, shall be applied over all motor carriers accepting and transporting freight between such points; and in no instance should a rate be published or applied which exceeds the

aggregate of published intermediate rate, class or commodity, or class and commodity, unless and until proof of the reasonableness of such rate is submitted to and approved by the Commission, provided that in the initial filing penalties will not apply for violation of this rule until such is called to the attention of the carriers and reasonable opportunity is given for adjustment or justification.

Even here, however, a carrier retains the right to file an independent rate, which may be lower than class rates in a tariff. *See* Deposition of David Screws at 73–75. A Transportation Rate Specialist for the Mississippi Commission has described the uniformity generally occurring in Mississippi intrastate rates as "unwritten law." *Id.* at 71.

*North Carolina*—Since 1947 the North Carolina Utilities Commission has been charged with the exclusive authority to make rates for all motor common carriers subject to its jurisdiction.

House Bill 417 of the North Carolina Legislature, entitled "An Act to provide for Uniform and Joint Rates Among Motor Carriers of the Same Class" contains provisions similar to those in the federal Motor Carrier Act. The bill, which was enacted by the state legislature, N.C.Gen.Stat. § 62–152.1, allows two or more carriers to enter into an agreement relating to "rates, fares, classifications, divisions, allowances or charges . . . [f]or the purpose of achieving a stable rate structure." The law further provides that it "shall be the policy of [the State of North Carolina] to fix uniform rates for the same or similar services by carriers of the same class." As in Section 5a of the Motor Carrier Act, the parties to the agreement may apply to the state public service commission for approval of the agreement. The parties to any agreement so approved are relieved from the operation of the state antitrust laws in the making and carrying out of the agreement.

*Tennessee*—Under Tennessee law, the Tennessee Public Service Commission fixes the rates which motor carriers may charge. Although any carrier is permitted to reduce

its rates without prior authorization of the Commission, no general increase is permitted until hearings have been held and the approval of the Commission secured. Rule .40 of Chapter 1220–2–1 of the Tennessee Public Service Commission, Division of Motor Carriers, adopts Section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b, providing:

> The rules and regulations governing the agreements between or among two or more carriers relating to rates, fares, classifications, division, allowances or charges (including charges between carriers and compensation paid or received for the use of facilities or equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation, or establishment thereof as set forth by the Interstate Commerce Commission in Section 5a of the Interstate Commerce Act, are hereby adopted by the Tennessee Public Service Commission; providing, however, that the final determination on any rates, fares, classification, divisions, allowances, charges, rules and regulations or procedures shall be left in its final determination to the Tennessee Public Service Commission.

## THE ROLE OF THE RATE CONFERENCES

Each of the three defendant conferences operates in the state of North Carolina. NCMCA's procedures are typical of all three. Its rate proposals to the North Carolina Utilities Commission are formulated in NCMCA's rate committee and then submitted to the Commission for approval, disapproval, or modification. Each member of NCMCA is entitled to have a representative on the rate committee; when the rate committee meets to consider rate proposals, shippers are invited to be and are present during the discussion of rate proposals. Approximately 300 shippers subscribe to the NCMCA tariff, and therefore receive notice of all meetings of the NCMCA rate committee. Many shippers send their professional rate specialists to the rate committee meetings. After a discussion of a rate proposal

by carriers and shippers, the shippers and their rate specialists leave and the members of the rate committee vote on the proposal by secret ballot. Members of NCMCA are not bound by the action of the rate committee, but instead have the right to announce and file an independent rate proposal with the Commission.

Where general rate increase proposals are involved, the rate committee of NCMCA may meet with members of the two other North Carolina rate bureaus, SMCRC and MCTA. On some occasions NCMCA gives its members notice of the meeting dates of the general commodity rate committees of SMCRC and MCTA. Shippers are also invited to and do attend the meetings, and many shippers send their rate specialists. The defendants claim the joint meetings are encouraged by the shippers because they can attend just one rate committee meeting on a proposed general rate increase rather than three. After a discussion of the proposed increase by shippers and carriers, the shippers and their rate specialists leave and the members of the NCMCA rate committee vote by secret ballot on a rate proposal separately from the rate committees of SMCRC and MCTA.

Where general rate increase proposals are involved, the rate bureaus may submit the same proposals to the Commission with the same effective date, but each conference makes a separate decision on the proposal, and submits its proposal to the Commission separately. When a general rate increase is proposed to the Commission for its action, NCMCA may avail itself of SMCRC personnel to prepare traffic studies to be presented at the hearing, and these studies are sometimes presented by the three bureaus at a Commission hearing.

## REGULATORY PROCEDURE

Procedures within each commission for review of published rates tend to be uniform. A published rate goes into effect unless set down for a hearing by the commission. The commissions consistently require hearings, however, and an order scheduling a hearing automatically suspends a proposed tariff.

In North Carolina, no general rate increase has been granted without a hearing before the Commission, with the exception of an emergency fuel surcharge allowed on an interim basis during the Arab oil embargo in 1974. Prior to the hearing, the North Carolina Commission's Public Staff undertakes a separate, independent study into the necessity of the proposed increase. The Public Staff will require the carriers to furnish freight bills and information concerning other expenses so that it can arrive at an operating ratio to submit as evidence at the hearing. In addition, the Public Staff undertakes on-site review and verification of motor carrier books and records in order to gather evidence to be submitted at the hearing. After its investigation, the Public Staff through sworn testimony at the hearing will make a recommendation as to a proposed rate increase.

Where a general rate increase proposal is involved, the matter is heard by the Commission en banc or by a panel of three Commissioners. The hearing is open to the public, and evidence may be submitted by any interested party, including the appli-cant, any intervenor, the Public Staff and the utility division of the Attorney General's office in North Carolina. At a hearing on a general rate increase, NCMCA and MCTA may rely on a rate justification statement prepared for them by SMCRC. The statement may contain information about rates in other cases.

The record, in sum, reveals a relationship between the defendants and the regulatory processes in which they participate that ranges from friendly to intimate. The states, as amici, have stressed the integral role of the conferences, and it is clear that, at the least, they are a part of daily regulatory life. Amidst the many ties between the states and the conferences, however, two important factors are not present in any of the subject states. First, no state requires that all rates among competing carriers for identical service be uniform.[5] Second, no state requires, either by statute or regulation, or other express legislative or administrative mandate, that rates proposed by carriers be formulated or published by rate conferences. These facts, partic-

---

5. Had the defendants argued, or had they established, that state law required all prices for identical services along the same route be uniform, this would be a very different case. We do not doubt that the five subject states are capable of entirely displacing the marketplace mechanism of setting prices with a system in which price competition plays no part. The states might have determined that their businesses and consumers would be best protected by a regulatory rate-making process that mandates uniform prices for a given service, typically based on a "just and reasonable" standard, than by the marketplace. Consequently, they could have replaced price competition with a state-mandated price-setting scheme in which intrastate common carriers would compete, but only by means other than price competition.

The nature of the carrier's participation in such a system regulated by legislative or administrative mandate would seem to be entirely different from the nature of its role in the marketplace. Where price competition is permitted (and protected), the individual participant attempts to lower prices so as to attract business from his competitors. Once prices are regulated, however, his participation in the price-setting "system" changes significantly, for his interest will usually lie in raising prices instead of lowering them. By charging a lower price he will ordinarily not gain an advantage over his competitors, who must always charge an identical price. Moreover, he will act in essentially the same manner regardless of whether he is alone or combining with other carriers, by attempting to convince the regulatory body to accept higher tariffs.

Were prices made uniform by state mandate, we would question the applicability of an antitrust theory designed to stimulate price competition. Indeed it would be doubtful that such practices as are engaged in by the defendant conferences could correctly be said to be "in restraint of trade," within the meaning of Section 1 of the Sherman Act. The parties have made it clear, however, that each of the subject states guarantees to individual carriers the right to charge rates lower than their competitors' rates for identical service. E. g., Statement of Material Facts, submitted in support of SMCRC's motion for summary judgment, filed Aug. 1, 1978, at 3, 4. By preserving the carriers' right of independent action, the subject states have permitted, to an admittedly limited degree, price competition. Within the range of rates that will be approved as just and reasonable, see United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023 (1935), the states do not impede the ability of the carriers to set prices competitively.

ularly the second, provide the primary basis for our resolution of the issues before the court.

Based on the existing record, the parties are in agreement that the action is ripe for summary judgment. We concur, not merely because of the cross-motions, but because we agree that the existing disputes among the parties and amici are ones of characterization and law, not of fact. Extensive briefing of the action has narrowed the issues to three: first, whether the defendants' activities are immunized from antitrust liability by the "state action" doctrine; second, whether the defendants are protected by the "Noerr-Pennington" doctrine; and finally, whether their practices, if unprotected, are antitrust violations as to which the court should now enter summary judgment. We resolve each of these in the government's favor and conclude that the defendants are in violation of the Sherman Act.

## STATE ACTION IMMUNITY

■ The pivotal issue in this action is whether the challenged practice of collective rate publication falls within the category of private activities that are immune from the antitrust laws under the "state action" doctrine. This question has received by far the greatest attention from the parties in their extensive briefing of the cross-motions for summary judgment. Besides being central to the case, the issue is, we think, a particularly difficult one. Application of the state action doctrine may call for extended inquiry and analysis of a state's regulatory statutes and programs; of the mix of public and private participation in administrative decisions; and even, perhaps, of the economic theory underlying a legislative scheme. See L. Sullivan, Handbook of the Law of Antitrust 738 (1977). To an extent, our resolution of the question obviates the need for such extraordinary probing, for we will conclude that the absence of actual compulsion renders the state action doctrine unavailable to each of the defendants. Nevertheless, any venture into the twilight zone dividing the realms of uncontested state and federal sovereignty requires that the traveller proceed with extraordinary caution.

The state action doctrine begins with Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). California, by statute, had established a scheme whose admitted purpose was to maintain prices and restrict competition among raisin growers. The growers would develop, in combination, marketing and pricing programs which they would submit to a state commission for approval. The commission would sanction a program where it found, after a hearing, that the program would prevent agricultural waste without allowing excessive profits to the growers, and where the program was approved upon referendum by a requisite number of growers.

A raisin grower brought suit in federal court challenging the program, inter alia, as invalid under the Sherman Act. Chief Justice Stone rejected the challenge, holding that Congress, in enacting the Sherman Act, did not intend to prohibit state action regulating economic activity:

Here the state command to the Commission and to the program committee of the California Prorate Act is not rendered unlawful by the Sherman Act since, in view of the latter's words and history, it must be taken to be a prohibition of individual and not state action. It is the state which has created the machinery for establishing the prorate program. Although the organization of a prorate zone is proposed by producers, and a prorate program, approved by the Commission, must also be approved by referendum of producers, it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy. The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by force of agreement or combination which the Sherman Act prohibits. The state itself exercises its legislative authority in making the regu-

lation and in prescribing the conditions of its application. The required vote on the referendum is one of these conditions.

The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.

317 U.S. at 352, 63 S.Ct. at 314 (citations omitted).

Unresolved by the decision in *Parker* —and perhaps unresolved to this day [6]—is the question whether the doctrine announced in that case would protect not only the state itself, but private parties acting under state mandate. Read most conservatively, the quoted passage holds only that the state's immunity as a sovereign is not undermined by private participation in the state program. Yet the language also hints that the state may, in the exercise of its sovereignty, shelter individuals from antitrust liability, and that this immunity may in turn survive even where the private party has participated in the state's actions. Thus, *Parker* offered a basis for believing first, that a private individual acting at the command of a state sovereign could avoid the effect of federal antitrust laws, and second, that the individual's participation in bringing about the state action would not threaten his immunity thereunder.

Neither of these notions was significantly shaken in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). The Supreme Court held that enforcement of a price-fixing schedule by state and county bars was not exempt under *Parker v. Brown* because the activity was not compelled by the state:

The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the state acting as sovereign.

421 U.S. at 790, 95 S.Ct. at 2015. Thus, the court rejected the respondents' assertion that because their actions were "prompted" by the state, no antitrust liability could attach. Moreover, the court suggested that compulsion would not be the sole criterion, but that before the *Parker* doctrine afforded him safe conduct through the forbidden territory of anticompetitive practices, a private party might have to make a yet-unspecified additional showing:

Here, we need not inquire further into the state-action question because it cannot fairly be said that the state of Virginia through its Supreme Court Rules required the anti-competitive activities of either respondent.

Precisely what would have to be shown in such a case was the subject of *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). Detroit Edison, an investor-owned public utility, operated under a regulatory scheme similar to those involved in this action. Detroit Edison would file tariffs for the sale of electric power with the Michigan Public Service Commission, which was empowered by state statute "to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of such public utilities." 428 U.S. at 584, 96 S.Ct. at 3114. The Commission would approve, modify, or reject the tariffs as filed. While Detroit Edison was free to propose modifications at any time, Michigan law forbade deviation from any tariff actually in force.

---

**6.** *See Bates v. State Bar of Arizona*, 433 U.S. 350, 361 n.13, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), noting that only four justices joined in that part of *Cantor v. Detroit Edison*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), holding *Parker* inapplicable to private defendants. In *Cantor*, however, Justice Stevens went on to suggest circumstances under which

merely private conduct required by state law would still be exempt from the Sherman Act. Since his discussion of those circumstances was adopted by a majority of the court, the question of whether private parties are protected under *Parker* is largely mooted: a private party claiming "state action" exemption must always satisfy the stricter *Cantor* requirements.

The Commission had approved one of Detroit Edison's tariffs containing a program of free distribution of standard-size light bulbs to customers. The petitioner, a retail druggist selling light bulbs, attacked the scheme as an illegal tying arrangement. The petitioner claimed the scheme allowed Detroit Edison to use its monopoly status in the electric power market to increase its power and reduce competition in the light bulb market. Detroit Edison answered that the program was protected under *Parker* and *Goldfarb*, because it was compelled by the state acting as sovereign.

As augured in *Goldfarb*, the court determined that the respondent's showing of formal compulsion was not enough. Justice Stevens' opinion for the court analyzed the state action in two sections. First, he held that *Parker v. Brown* only conferred antitrust immunity on the state agents acting in their official capacity. 428 U.S. at 590–91, 96 S.Ct. 3110. The language of *Parker*, Justice Stevens reasoned, was carefully chosen so as to exclude mere private parties claiming to be acting under compulsion of state law. 428 U.S. at 590–92 & n.24, 96 S.Ct. 3110.

Only three other justices joined in the portion of Justice Stevens' opinion holding *Parker* inapplicable to the Cantor facts. 428 U.S. at 581, 96 S.Ct. 3110. Backed by a majority of the court, however, Justice Stevens went on to suggest two instances where private conduct required by state law might still be exempt from the Sherman Act. First, Justice Stevens suggested that "it would be unacceptable ever to impose statutory liability on a party who had done nothing more than obey a state command." 428 U.S. at 592, 96 S.Ct. at 3118. This "unfairness" theory recognizes the predicament of the citizen caught between conflicting demands of independent sovereigns, but only where the conflict is real. Justice Stevens refused to find unfairness in the facts before him because the predicament with which the respondent might claim to be faced was largely illusory. The respondent could not claim to have "done nothing more than obey the command of [its] state sovereign," *id.*; Justice Stevens' perceptive

analysis of the regulatory process revealed it to be "a blend of private and public decisionmaking" in which the private element of participation is so significant as to render the notion of coercion inapplicable to a characterization of the individual's compliance. The tying arrangement had not merely been imposed upon the respondent by the state Commission. It was the respondent who conceived, developed, and proposed the program; who argued the program's merits before the Commission; and who chose not to exercise its ever-present right to petition the Commission for elimination of the program.

Justice Stevens also supposed that Congress did not intend to impose conflicting antitrust standards upon an area already pervasively regulated by the state. 428 U.S. at 595, 96 S.Ct. at 3119. Any private party seeking a defense under this "already regulated" theory, however, would necessarily face three obstacles:

First, merely because certain conduct may be subject both to state regulation and to the federal antitrust laws does not necessarily mean that it must satisfy inconsistent standards; second, even assuming inconsistency, we could not accept the view that the federal interest must inevitably be subordinated to the State's; and finally, even if we were to assume that Congress did not intend the antitrust laws to apply to areas of the economy primarily regulated by a State, that assumption would not foreclose the enforcement of the antitrust laws in an essentially unregulated area such as the market for electric light bulbs.

*Id.*

Each of these related considerations in part explained Justice Stevens' refusal to exempt the tie-in under the "already regulated" theory. Most significant was the fact that the Michigan regulatory scheme was not to any meaningful degree concerned with the sale of light bulbs. This peripheral market was an "essentially unregulated area:"

The application of that standard to this case inexorably requires rejection of respondent's claim. For Michigan's regulatory scheme does not conflict with federal antitrust policy and, conversely, if the federal antitrust laws should be construed to outlaw respondent's light-bulb-exchange program, there is no reason to believe that Michigan's regulation of its electric utilities will no longer be able to function effectively. Regardless of the outcome of this case, Michigan's interest in regulating its utilities' distribution of electricity will be almost entirely unimpaired.

428 U.S. at 598, 96 S.Ct. at 3121.

The court's willingness in *Cantor* to probe the degree of state interest and involvement has led to the generally-approved supposition that the state action doctrine implies a "requirement that the state's regulatory interest be evidenced by active supervision and a clear statement of intent to regulate" the alleged activity. *See United States v. Southern Motor Carriers Rate Conference*, 439 F.Supp. 29, 41 (N.D.Ga. 1977), *quoting* 81 Harv.L.Rev. 1, 229–47 (1976). The defendants have striven to present the five subject regulatory processes in a light that best demonstrates that this standard has been more than satisfied. They have pointed to the close scrutiny with which they contend the state commissions review proposed rates and to the central function which collective ratemaking purportedly plays in the overall system of rate proposal and review. MCMCA also emphasizes North Carolina's "little section 5(a)," which announces a state policy approving of collective ratemaking and exempting the conference activities from the North Carolina antitrust laws.

The government, on the other hand, refuses to concede what it insists is the pivotal state action question. The government insists that as private parties, none of the defendants may invoke the state action doctrine without first showing that its challenged activities are compelled by the states acting as sovereigns. Nothing in any case decided after *Goldfarb*, the government argues, modifies this basic requirement, and regardless of the virtual romance between the states and their ratemaking conferences, no state *requires* that rates be published collectively.

At the outset, we note that even under a test that does not include state compulsion, the defendants face an uphill battle. The Supreme Court held in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 435–64, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) that collective setting of interstate railroad rates was not exempt from the antitrust laws merely because the Interstate Commerce Commission held power to approve the rates. And in *Cantor*, 428 U.S. at 596, 96 S.Ct. at 2120, the Court reasoned, "Congress could hardly have intended state regulatory agencies to have broader power than federal agencies to exempt private conduct from the antitrust laws." Moreover, even though rate publication generally may be more central to the regulatory schemes here than light bulb sales were in *Cantor*, the *collective* aspect of rate publication might prove peripheral. We need not decide the question here, however, for we agree with the government that compulsion by the state acting as a sovereign remains, as expressed in *Goldfarb*, a threshold barrier to application of the state action doctrine.

The first reason why compulsion is necessary is that this is the precise principle for which *Goldfarb* stands. The *Goldfarb* court found that further inquiry into the state action question was pretermitted by an absence of state compulsion. This holding, at least as it applies to private defendants, has been untroubled by subsequent decisions.

The defendants rely principally on *Cantor* in arguing that the compulsion requirement is less than absolute. Yet compulsion was the very starting point of that case. After holding *Parker* inapplicable to activities of private parties, Justice Stevens considered the availability of analogous state action principles to a private defendant:

> In this case we are asked to hold that private conduct *required* by state law is exempt from the Sherman Act. Two quite different reasons might support such a rule.

428 U.S. at 592, 96 S.Ct. at 3118 (emphasis supplied). The court went on to enunciate the "unfairness" and "already regulated" concepts that might support state action protection. The court premised its discussion, however, on the fact that the tie-in arrangement was "required," by state law.

The debate between the majority and dissenting opinions took place within the context of a private party's undertaking of state-mandated practices, and it is this context which gives meaning to the debate. Justice Stevens, writing for the court, and Justice Stewart, writing for the three dissenting justices, focused upon two related themes. The first was the extent to which courts might inquire beyond the formality of state compulsion. Justice Stewart found compulsion sufficient to invoke state action immunity anytime a state approved or established a practice, where the effect of approval was to proscribe subsequent deviation. The regulatory process, he reasoned, was a three-step affair in which the private party proposes, the state decides, and the private party complies. Proposal was protected by the First Amendment principles expressed in *Eastern Railroad Conference v. Noerr Motors*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Compliance was protected by *Parker* and *Goldfarb*. 428 U.S. at 624, 96 S.Ct. 3110.

Justice Stevens answered that this analysis was simplistic, for it ignored the reality that regulatory decision making is typically a process in which public and private input are continuously combined. Formal compulsion by the state, he argued, ought not be given automatic deference by the courts where the compulsion also lacked substance.

The second, related, debate in *Cantor* centered on notions of federalism. Justice Stewart contended that *Goldfarb* compulsion was sufficient to bar federal incursion into the state realm:

> *Goldfarb* clarified *Parker* by holding that private conduct, if it is to come within the state-action exemption, must be not merely "prompted" but "compelled" by state action. Thus refined, the doctrine performs the salutary function of isolating those areas of state regulation where the State's sovereign interest is, by the State's own judgment, at its strongest, and limits the exemption to those areas.
>
> Beyond this the Court cannot go without disregarding the purpose of the Sherman Act not to disrupt state regulatory laws.

428 U.S. at 637–38, 96 S.Ct. at 3140 (footnotes omitted).

The majority conceived of a more forceful application of federal law. The "already regulated" theory of immunity, for instance, was only to be invoked where confrontation was unavoidable, and even then did not constitute a rule of automatic deference:

> First, merely because certain conduct may be subject both to state regulation and to federal antitrust laws does not necessarily mean that it must satisfy inconsistent standards; second, even assuming inconsistency, we could not accept the view that the federal interest must inevitably be subordinated to the State's;
>
> . . .

428 U.S. at 595, 96 S.Ct. at 3120.

Each of these questions is given meaning in the context of state compulsion of private activity. The first challenges the genuineness of the coercion. Such an inquiry would be unnecessary—as it was in *Goldfarb*—were there no coercion to judge. Similarly, the federalism debate derives its intensity from the circumstance of opposing *demands* from discrete sovereigns.

Thus, the *Goldfarb* inquiry is not discarded by *Cantor*. The court must begin with the threshold determination of whether the defendants' acts are "compelled by direction of the State acting as a sovereign." 421 U.S. at 791, 95 S.Ct. at 2015. Only where that milepost is reached may we test the extent of the state's involvement in the compelled activity.[7] In the case before the

---

7. For an excellent presentation of the pertinent inquiry in such a case, *see Sullivan, supra*, § 238 at 738–39.

court, there is no such necessity: it is conceded by all sides that the practice of joint rate publication is not expressly required by any statute, regulation or other legislative or administrative command of any of the subject states. Though informally ratified and even encouraged by the procedures and pronouncements of the various regulatory agencies and, to a limited degree, by the states' laws themselves, the practice is nowhere compelled.

██ The parties have not produced, and we have not found, a single case decided subsequent to *Goldfarb* in which activities not required by the state were held immune under the state action doctrine. *See New Motor Vehicle Board v. Fox*, — U.S. —, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Indeed, the subsequent cases have tended to reiterate the compulsion requirement. *E. g., Bates*, 433 U.S. at 359, 97 S.Ct. 2691.[8]

A related strain of cases might suggest a less stringent test. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court examined the extent to which *Parker* immunity was available to a city operating a municipal electric utility. The Court concluded:

> [T]he *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service.
>
> . . .
>
> While a subordinate governmental unit's claim to *Parker* immunity is not as readily established as the same claim by a state government sued as such, we agree with the Court of Appeals that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of" [*City of Lafayette v. Louisiana Power & Light Co.*, 532 F.2d 431, 434 (5th Cir. 1976)].

435 U.S. at 413–415, 98 S.Ct. at 1137, 1138 (footnote omitted).[9]

---

**8.** A review of existing authority on the state action doctrine suggests the necessity of specifying the meaning we ascribe to the notion of compulsion by the state. Professors Areeda and Turner have argued that courts ought not require state "compulsion" of a private activity as a prerequisite to invocation of the state action defense. P. Areeda & Turner, I *Antitrust Law* § 215 (1977). Over-application of the *Cantor* principle that many regulatory decisions are industry-initiated, these observors fear, may lead courts to find antitrust liability in circumstances where, unlike *Cantor*, the challenged private practice lies at the heart of the regulatory scheme. Areeda and Turner cite the facts in *Parker* to illustrate a situation in which industry participation in regulatory decision making should not render the state action defense unavailable.

Areeda and Turner, are employing a special definition of state "compulsion." They characterize both *Parker* and *Cantor* as cases in which there was not "compulsion," evidently based on the fact that the *impetus* for the state action came from the regulated entities.

The language of *Cantor*, and our discussion here, however, analyses compulsion differently. Justice Stevens specifically described the light bulb tie-in as "required." 428 U.S. at 592, 96 S.Ct. 3110. He then determined that such compelled activity might be protected under either an "unfairness" or an "already regulated" theory. In either case, the threshold compulsion that existed arose from the fact that state law *formally* required the tie-in by virtue of the Commission's having approved Detroit Edison's tariff: so long as there was no new filing, Detroit Edison had to continue the light bulb distribution program. It is only this minimal, formal, compulsion that we find to be a necessary element to a *Parker* defense.

**9.** Earlier in its opinion, the Court quoted, with apparent approval, the order of the Fifth Circuit:

> "A subordinate state governmental body is not *ipso facto* exempt from the operation of the antitrust laws. Rather, a district court must ask whether the state legislature contemplated a certain type of anticompetitive restraint. In our opinion, though, it is not necessary to point to an express statutory mandate for each act which is alleged to violate the antitrust laws. It will suffice if the challenged activity was clearly within the legislative intent. Thus, a trial judge may ascertain, from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of. On the other hand, as

■ *City of Lafayette* does announce a standard of state action immunity that protects activities "contemplated" by the state legislature, but confers this immunity only on state subdivisions. That a municipality should have to make a smaller showing than a private party is only natural, for the municipality is already a limited sovereign, exercising, to the extent conferred by the state, an array of governmental features and powers. The Court made this very point when it distinguished *Cantor*, pointing out that a municipality may claim to act "as an agent of the State." 435 U.S. at 411 n.40, 98 S.Ct. at 1135–36 n.40. Thus the standard governing the antitrust immunity accorded state subdivisions differs from, but does not modify, the rules applicable to a private party. *See also Duke & Co., Inc. v. Foerster*, 521 F.2d 1277 (3d Cir. 1975).

■ Finally, we realize that state compulsion might not always be an absolutely immutable requirement. The case may arise in which a regulatory or legislative scheme, while not explicitly requiring a particular act, is structured so as to render the act indispensable to compliance with the scheme. In this sense an anticompetitive activity may be protected because it is impliedly or constructively compelled by the state. We think, however, that this argument is foreclosed to the present defendants by *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). That case held collective rate setting by railroads to be subject to the antitrust laws despite the regulation of railroad rates by the Interstate Commerce Commission. It is true that the cost-saving features of collective ratemaking, which obviate the need for each carrier to make an independent investigation into the economic

factors affecting rates he should publish, may be more significant in the trucking industry. The defendants' memberships include many small businesses, which, unlike railroads, may be hard pressed to absorb the added expense incurred in making individual rate formulations. This, however, merely means that by imposing their respective regulatory systems upon the intrastate truckers, the subject states have increased the cost of doing business. The Sherman Act protects "competition, not competitors," *Brown Shoe, Inc. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 82 L.Ed.2d 510 (1962), and the added fact that the state scheme adversely affects smaller shippers does not justify an antitrust exemption.

## NOERR–PENNINGTON DOCTRINE

■ The defendants have devoted considerably less effort to advancing a *Noerr-Pennington* defense theory. The doctrine, briefly stated, holds that concerted action consisting solely of activities aimed at influencing public officials does not violate the Sherman Act.[10] The Supreme Court has expressly extended the doctrine to lobbying efforts before state administrative agencies. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The defendants argue that since all of their challenged activity is directed toward influencing the state commissions, no antitrust liability may attach.

The government answers that the complaint charges three distinct types of activity: (1) coordinating and fixing of rates; (2) presenting the collectively set rates to the state commissions; and (3) putting the rates into effect, ostensibly pursuant to state sanction. Implicitly conceding that

in *Goldfarb*, the connection between a legislative grant of power and the subordinate entity's asserted use of that power may be too tenuous to permit the conclusion that the entity's intended scope of activity encompassed such conduct. Whether a governmental body's actions are comprehended within the powers granted to it by the legislature is, of course, a determination which can be made only under the specific facts in each case. A district judge's inquiry on this point

should be broad enough to include all evidence which might show the scope of legislative intent. 532 F.2d, at 434–435 (footnotes omitted).
435 U.S. at 393–394, 98 S.Ct. at 1126–27.

10. For a discussion by this court of the doctrine and its origins, *see United States v. Southern Motor Carriers Rate Conference*, 439 F.Supp. 29, 46–47 (N.D.Ga.1977). *See also Sullivan, supra*, § 238 at 740–43.

the second activity is protected, the government contends that the first may be treated separately, and must itself give rise to antitrust liability.

This case is not technically one to which *Noerr-Pennington* has traditionally been applied. *Noerr* and its progeny have all involved concerted attempts to obtain governmental interference with a competitor. *See Sullivan, supra*, § 238 at 740. The parties have cited no cases in which courts have invoked *Noerr-Pennington* to immunize price fixing among competitors.

The First Amendment principles underlying *Noerr-Pennington* are nevertheless applicable by analogy. If the defendants may, in exercise of their right to petition the government, jointly submit rate proposals to the state commissions, it would follow that they must be permitted to confer and to formulate the rates they wish to propose. Just as the speaker must be permitted to prepare his notes and determine what he intends to say, so must the conferences be free to settle on the specific relief or benefits they seek to obtain from the commissions.

The difficulty with this analysis is that it ignores the teaching of *Cantor*. Justice Stevens' characterization of the regulatory process as a blend of public and private decision making illustrates that the regulated industry does not merely propose, but also decides. Even though the proposals require state sanction to take effect, the industry's participation in the process surpasses mere petitioning and renders the industry, in part, a decisionmaker.

This does not, of course, mean that *Noerr-Pennington* is inapplicable to rate making and related administrative activities. It does, however, suggest that a court may properly accord independent significance to the defendants' activities of rate formulation and proposal. First Amendment law has always recognized that even an activity which is itself communicative may nevertheless be penalized because of its non-speech aspects. *See, e. g., United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (draft card burning is conduct not protected by the First Amendment); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (civil rights demonstration on a sidewalk opposite a courthouse is "speech plus," entitled to a lesser degree of protection than pure speech); *Teamsters Local 695 v. Vogt*, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957) (the state may prohibit picketing directed at achieving a union shop in violation of state law). Here, we agree with the government that the defendants' activities of collective rate formulation constitute independently cognizable acts outside the scope of First Amendment protection or the *Noerr-Pennington* doctrine.

## THE SHERMAN ACT VIOLATION

In *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the Supreme Court held that collective rate publication by railroads constituted price fixing illegal under the antitrust laws even though the published rates were reviewed and approved by the Interstate Commerce Commission:

> [T]he Interstate Commerce Act does not provide remedies for the correction of all the abuses of rate-making which might constitute violations of the antitrust laws. Thus a "zone of reasonableness exists between maxima and minima within which a carrier is ordinarily free to adjust its charges for itself." *United States v. Chicago, M., St. P. & P. R. Co.*, 294 U.S. 499, 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023. Within that zone the Commission lacks power to grant relief even though the rates are raised to the maxima by a conspiracy among carriers who employ unlawful tactics. If the rate-making function is freed from the unlawful restraints of the alleged conspiracy, the rates of the future will then be fixed in the manner envisioned by Congress when it enacted this legislation. Damage must be presumed to flow from a conspiracy to manipulate rates within that zone.

324 U.S. at 460–61, 65 S.Ct. at 728. Relying on *Pennsylvania Railroad*, the courts appear to have assumed that collective rate-making

violates the Sherman Act. *See Pan American World Airways v. United States*, 371 U.S. 296, 305–06 & n.11, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); *Marnell v. United Parcel Services of America, Inc.*, 260 F.Supp. 391, 404–05 (N.D.Cal.1966).

The *Pennsylvania Railroad* case leaves the defendants very little breathing room. They argue, however, that their activities do not violate the Sherman Act (1) because the states, rather than the defendants, determine the prices to be charged by intrastate carriers; and (2) because the defendants' activities, properly viewed under Rule of Reason analysis, do not unreasonably restrain trade.

Throughout their extensive briefing of this case, the parties have debated the correct characterization of the defendants' actions. The government contends that the defendants are responsible for fixing intrastate trucking rates, and that the state commissions furnish no more than a formal stamp of approval. The defendants insist that they only propose, and that the "fixing" of rates is performed exclusively by the commissions.

The cases establish a middle ground and have the effect of refuting the defendants' protestations of nonparticipation in regulatory decision making. As a consequence, the government is correct to describe collective rate publication as price "fixing:" this is precisely the language employed by Justice Douglas in the *Pennsylvania Railroad* decision. 324 U.S. at 460–61, 65 S.Ct. 716. Similarly, the state action cases have uniformly recognized that state participation in an anticompetitive scheme does not render the private party a non-actor. *See Cantor*, 428 U.S. at 592, 96 S.Ct. 3110; *Goldfarb*, 421 U.S. at 791 & n.21, 95 S.Ct. 2004.

■ Moreover, the practice of collective rate publication easily fits the classic description of a "naked price restraint."

Since *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), it has been established law that price fixing among competitors is a *per se* violation of Section 1 of the Sherman Act. *See, e. g., Goldfarb*; *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Hartford-Empire Co. v. United States*, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945). Because the guiding principle behind all Sherman Act jurisprudence is the protection of competition, *see United States v. Joint Traffic Ass'n*, 171 U.S. 505, 577, 19 S.Ct. 25, 43 L.Ed. 259 (1898), any arrangement whose purpose or effect is to inhibit price competition is illegal. Such an arrangement need not be outright cartelization, so long as it brings about, or is intended to bring about, the "raising, depressing, fixing, pegging, or stabilizing" of prices. *Socony-Vacuum*, 310 U.S. at 223, 60 S.Ct. at 844.

■ The defendants' activities have precisely such an effect. The very function they serve is to coordinate the rates that their member carriers will charge. Within the "zone of reasonableness" in which, free from regulatory interference, market forces would otherwise determine price, the defendants have displaced competition with concerted pricing decisions. In so doing, they violate the Sherman Act at its most sensitive spot. The defendants' practices of collective rate coordination and publication are *per se* violations of Section 1, subject to injunction by this court. *See White Motor Co. v. United States*, 372 U.S. 253, 259–60, 83 S.Ct. 696, 9 L.Ed.2d 738 (1960) (summary judgment is appropriate in *per se* price fixing cases) (dictum). *See also First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).[11] We will therefore GRANT the

11. Nor would we necessarily reach a different result under rule of reason analysis. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."

*Board of Trade of the City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Considerations such as the need of the smaller shippers for the supposed efficiencies accompanying collective rate formulation and the fact that current intrastate

government's motion for summary judgment, holding that the defendants have violated Section 1 of the Sherman Act.

## RELIEF

The arguments by the defendants and *amici* intimate that the relief sought by the government will significantly interfere with the regulation of intrastate trucking in the subject states. We are of course hopeful that whatever transition is necessitated by this order be effected in the least disruptive manner possible. At the same time, it is apparent that the transition will inevitably cause difficulties, and that these must not stand in the way of swift compliance with the Sherman Act. The court will therefore direct the parties to this action to confer in an attempt to reach agreement as to the proper relief to be afforded by the court.[12] Within thirty (30) days of the date of this order, the parties shall, if possible, submit to the court a joint agreement detailing the nature and precise terms of the relief to be awarded. If the parties are unable to reach an accord, they shall within the same thirty-day period: (1) so notify the court; (2) indicate those matters as to which there is agreement; and (3) submit proposals from each side in the areas of disagreement. The court will refrain from ordering interim relief, but expects that the parties will diligently proceed in complying with this order.

Accordingly, the court hereby GRANTS the government's motion for summary judgment and DENIES the defendants' motions for summary judgment.

IT IS SO ORDERED.

rates are materially lower than interstate rates in the subject states, while perhaps quite meaningful from a policy standpoint, would have only limited significance to our inquiry. The focus would continue to be on the effect of collective rate-making on price competition among intrastate carriers.

12. The court expects that amici will be allowed full participation in all negotiations among the parties.