702 F.2d 532
 1983-1 Trade Cases 65,320
 UNITED STATES of America, Plaintiff-Appellee,
v.
SOUTHERN MOTOR CARRIERS RATE CONFERENCE, INC., and North
Carolina Motor Carriers Association, Inc.,
Defendants-Appellants,
National Association of Regulatory Utility Commissioners,
Intervenor-Appellant.
 No. 79-3741.
 United States Court of Appeals,
Fifth Circuit.*
Unit B
 April 11, 1983.
 
 Allen I. Hirsch, Simon A. Miller, Atlanta, Ga., for Southern Motor carriers.
 Rea, Cross & Auchincloss, Bryce Rea, Jr., David Hyler Coburn, Washington, D.C., for North Carolina Motor and amicus curiae Nat. Motor Freight Traffic Ass'n.
 Paul Rodgers, Gen. Counsel, Charles D. Gray and Pamela R. Melton, Washington, D.C., for intervenor.
 Robert P. Gruber, Gen. Counsel, Wilson B. Partin, Jr., Deputy Gen. Counsel, Raleigh, N.C., for amicus curiae State of N.C. and N.C. Utilities Comm.
 Barry Grossman, Nancy C. Garrison, Appellate Sec., Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HENDERSON, HATCHETT, ANDERSON and THOMAS A. CLARK, Circuit Judges.
 FRANK M. JOHNSON, Jr., Circuit Judge:
 
 
 1
 In November 1976 the United States instituted this action under Section 4 of the Sherman Act, 15 U.S.C.A. Sec. 4, to enjoin the continuing violation of Section 1 of the Sherman Act, 15 U.S.C.A. Sec. 1, by three rate bureaus. These defendants, Southern Motor Carriers Rate Conference, Inc. (SMCRC), North Carolina Motor Carriers Association, Inc. (NCMCA), and Motor Carriers Traffic Association, Inc. (MCTA), represent common carriers before the regulatory commissions of the states of Alabama, Georgia, Mississippi, North Carolina, and Tennessee. The rate bureaus perform three basic functions: (1) they provide a forum for competing member carriers to discuss and agree on rates for intrastate transportation of general commodities to be proposed to state public service commissions for approval; (2) they publish tariffs and supplements containing the rates on which the carriers agree; and (3) they provide counsel, staff experts, and facilities for the preparation of cost studies and other exhibits and testimony for use in support of proposed rates at hearings held by the regulatory commissions.[1] The government challenged the first of these functions as price fixing in violation of Section 1 of the Sherman Act.
 
 
 2
 The district court granted the government's motion for summary judgment and held that defendants were in violation of Section 1. The court rejected arguments[2] that defendants' activities were immune under the state action doctrine or under the Noerr-Pennington doctrine. Defendants SMCRC and NCMCA and intervenor NARUC appealed, and a panel of the former Fifth Circuit affirmed. United States v. Southern Motor Carriers Rate Conference, Inc., 672 F.2d 469 (5th Cir. Unit B 1982). The Court en banc voted to rehear the case to consider two issues: first, whether a private party may avail itself of the state action exception to federal antitrust laws only if the state compels it to perform the disputed actions; and second, whether, if state compulsion is not necessary, the state policies here at issue were sufficiently clearly articulated and affirmatively expressed for the state action exception to apply. We hold that compulsion is required of private parties and thus do not reach the second issue. Accordingly, we affirm the judgment of the district court.
 
 
 3
 The Supreme Court first clearly articulated the "state action" exception to the antitrust laws in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). At issue in Parker, a suit against state officials, was the applicability of the Sherman Act to an agricultural proration system established by a California statute authorizing a commission to impose marketing programs for raisins upon the petition of raisin growers. Once the program was approved and instituted by the commission, participation by the growers was mandatory; under the statute, growers who refused to follow a program once instituted were subject to fines and imprisonment. Id. at 347, 63 S.Ct. at 311-312.[3] Analyzing the intent of Congress in enacting the Sherman Act, the Court concluded that, insofar as the Act applied only to "persons," Congress intended application of the Act to the "business combinations" of "individuals and corporations." Id. at 351, 63 S.Ct. at 313-314. The Act was not, therefore, intended to "restrain a state or its officers or agents from activities directed by its legislature." Id. at 350-51, 63 S.Ct. at 313. Congress made no mention of states, and "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." Id. at 351, 63 S.Ct. at 313.[4] Applying this analysis to the California program, the Court reasoned that the Sherman Act was not intended to apply to the state of California in its establishment of a program operating under "state command." "The state in adopting and enforcing the prorate program," the Court concluded, "made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." Id. at 352, 63 S.Ct. at 314. The Court's opinion in Parker therefore established the state action issue as a question of whether the challenged acts could be attributed to the state as sovereign.
 
 
 4
 The fact that the Court in Parker concluded that Congress did not intend to restrain anticompetitive acts attributable to states of course did not mean that only states could assert a state action defense. Thus, while Parker's holding applied to state party defendants, the Supreme Court in Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), suggested that a defense of state action may also be available to private parties under certain limited circumstances. Goldfarb was a class action against the Virginia State Bar and a Virginia county bar association in which the Court considered the validity under the Sherman Act of a minimum fee schedule for lawyers published by the county bar association. After determining that the county bar association was not a state agency,[5] the Court addressed the "threshold inquiry" of whether the bar association's "activity is required by the State acting as sovereign." Id. at 790, 95 S.Ct. at 2015. The county bar association had argued that its action was "prompted" by the state, but a unanimous Court held that this was not enough for a state action defense. Rather, the action must be "compelled by direction of the State acting as a sovereign." Id. at 791, 95 S.Ct. at 2015. Deciding that the state of Virginia did not require the publication of minimum fee schedules, the Court stated that it "need not inquire further into the state-action question," id. at 790, 95 S.Ct. at 2015, and held that the challenged action was not state action for Sherman Act purposes.
 
 
 5
 After Goldfarb, the question remained as to what would be required in addition to the threshold compulsion requirement for a finding of state action for private parties. This question was partially answered the next term in Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). At issue in Cantor was a program in which Detroit Edison--a private defendant--provided light bulbs to its electricity customers without a separate charge. Detroit Edison could not discontinue its program, the Court stated, without the approval of a Michigan state commission, and in this sense the threshold compulsion requirement was at least formally satisfied. See id. at 592, 96 S.Ct. at 3118 ("In this case we are asked to hold that private conduct required by state law is exempt from the Sherman Act." (emphasis added)); id. at 594, 96 S.Ct. at 3119.[6] As Goldfarb had hinted, however, compulsion alone was not enough, particularly in Cantor, where "there can be no doubt that the option to have, or not to have, such a program is primarily [Detroit Edison's], not the [State's]," id. at 594, 96 S.Ct. at 3119, and where the state was neutral as to the desirability of providing the light bulbs. Noting that it would not find an exception to federal antitrust law unless one was required for the state regulatory program to function, a majority of the Court concluded that Michigan's policy interest in regulating electricity would not be affected by the inapplicability of the state action doctrine.[7] Thus, although Detroit Edison's action was formally commanded by the state, the Court declined to grant the company state action immunity where no significant state interest would be undermined by enforcement of federal antitrust law. This discussion as to the factors necessary for private party invocation of the state action doctrine is, however, for the most part not at issue in the present case. It is enough for our purposes that the Court premised its discussion on the fact that Detroit Edison's action was "required" by the state. Id. at 592, 96 S.Ct. at 3118. In fact, although there were four separate opinions in Cantor, none of the Justices questioned the continued validity of Goldfarb 's requirement--which had been imposed by a unanimous Court--that a private party must first meet the compulsion requirement as a threshold matter.[8]
 
 
 6
 In our view, the analytical basis for Goldfarb 's compulsion requirement for private parties traces its roots directly to the analysis in Parker. The lesson of Parker is that the legislative history and wording of the Sherman Act point to the conclusion that Congress wished to restrain the anticompetitive actions of "persons," that is, "individuals and corporations." Thus, an anticompetitive action undertaken by a private party necessarily is proscribed by the Sherman Act unless for some reason that action cannot fairly be attributed to the private party. Under Goldfarb, when a state compels the private party to act, it deprives him of his freedom of choice; his action, being mere obedience, cannot be described as individual action and must therefore be attributed to the state. The Court elaborated on this freedom of choice analysis in Cantor after reviewing Supreme Court cases involving state action immunity:
 
 
 7
 In each of these cases the initiation and enforcement of the program under attack involved a mixture of private and public decisionmaking. In each case, notwithstanding the state participation in the decision, the private party exercised sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision.
 
 
 8
 428 U.S. at 593, 96 S.Ct. at 3119. This reasoning also explains the Court's statement in Parker that a state may "not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful," 317 U.S. at 351, 63 S.Ct. at 314, and its statement in Cantor that "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity," 428 U.S. at 592-93, 96 S.Ct. at 3118-3119 (footnotes omitted). So long as the state merely allows, but does not compel, anticompetitive conduct, the decision to adopt such conduct remains that of the individual and is within the scope of the Sherman Act. Regardless of how strongly a state may wish to remove private action from the Act's jurisdiction, it will not succeed unless it structures a program so as to make individual actions the actions of the state itself--by means of the mechanism of compulsion.[9]
 
 
 9
 A necessary corollary of the rationale of Goldfarb and Cantor is that compulsion should not be required of state defendants. Regardless of their motives for undertaking anticompetitive behavior, states are nevertheless acting as states.[10] Since Goldfarb, the Court has consistently pointed out that the analysis of state action differs substantially depending on whether the defendant is a private party or a public institution. See, e.g., Bates, 433 U.S. at 361, 97 S.Ct. at 2697-2698 (Cantor would have been an "entirely different case" had the action been against a public official or public agency rather than against a private party); Cantor, 428 U.S. at 600-601, 96 S.Ct. at 3122-3123 (plurality opinion) (noting that Parker might have been different had there been a private defendant); id. at 585-92, 96 S.Ct. at 3115-3118 (distinguishing Parker as case against public officials). The same analysis applies to municipalities, at least when they act as agents of the state. Thus, the Supreme Court has not required compulsion for municipalities, but has held that when a state indicates its intention that the municipality may act as an instrumentality of the state--i.e., when the state "sanctions" anticompetitive behavior of the municipality--a state action defense may be available to the municipality. Community Communications Co. v. City of Boulder, 455 U.S. 40, 51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982); City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 413, 98 S.Ct. 1123, 1136-1137, 55 L.Ed.2d 364 (1978) (plurality opinion).
 
 
 10
 Under the foregoing analysis of the state action doctrine, we have little difficulty in holding that the activities of appellants are not immune from Sherman Act coverage. Specifically, a defense of state action fails because this litigation was brought against private defendants and none of the states in question compels the ratemaking bureaus to set rates collectively.[11] Because the anticompetitive practices challenged by the government are undertaken at the individual election of the carriers and the rate bureaus, appellants fail to pass the threshold test established in Goldfarb. Thus, appellants' action cannot be said to constitute state action.
 
 
 11
 Appellants, however, urge that state action analysis has been changed in their favor by the recent Supreme Court decision in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Midcal involved a challenge under the Sherman Act to a California statute that required wine producers and wholesalers to file fair trade contracts or price schedules with the state. Under the statute, wholesalers could not resell wine to retailers at prices below those on the contracts or schedules. In order to evaluate whether the state defendant California Department of Alcoholic Beverage Control was state action immune, the Court briefly reviewed several of the state action cases discussed above and then stated that "[t]hese decisions establish two standards for antitrust immunity under Parker. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself. City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410 [98 S.Ct. 1123, 1135, 55 L.Ed.2d 364] (1978) (opinion of Brennan, J.)." 445 U.S. at 105, 100 S.Ct. at 943. California's regulatory system, the Court ruled, met the first standard but not the second; it therefore refused to hold that the state defendant's activity was outside the coverage of the Sherman Act. Applying Midcal to the facts in the present case, the government and appellants agree that each state actively supervises the collective ratemaking process,[12] so the second Midcal standard is satisfied. As to the first Midcal standard, the parties disagree concerning the importance of the fact that none of the five states compels the challenged anticompetitive activity. Appellants assert that, despite the lack of compulsion, their actions meet the first standard. This is because the Supreme Court allegedly abandoned the practice established in Goldfarb of requiring compulsion of private parties, as evidenced by the fact that the first standard did not specifically refer to compulsion. We disagree with appellants' argument for several reasons.
 
 
 12
 Initially, we question the very premise upon which appellants' argument is based--that the specific choice of wording in Midcal implies a rejection of a compulsion requirement for private parties. In the context of private parties, the first Midcal standard makes sense only if it includes a compulsion requirement. This is because we do not see how a private party can carry out a clearly articulated and affirmatively expressed state policy when it is left to the private party to carry out that policy or not as he sees fit. Our interpretation of the disputed passage in Midcal is that it should be read as a broad, general restatement of the Court's earlier holdings; the absence of any mention of compulsion in one specific application of the standard--that is, to private parties--therefore does not strike us as unusual. One additional factor points to the conclusion that the Court's choice of wording in Midcal does not imply a rejection of its prior holdings. The Court introduced the two standards with the statement that the prior decisions "establish" the standards, 445 U.S. at 105, 100 S.Ct. at 943, thus indicating that it did not view them as anything new. Furthermore, the Court used similar or identical language in earlier cases. See New Motor Vehicle Bd., 439 U.S. at 109, 99 S.Ct. at 411-412; City of Lafayette, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion); Bates, 433 U.S. at 362, 97 S.Ct. at 2698. If these cases did not alter the standard for state action immunity for private parties, we see no reason to believe that Midcal did.
 
 
 13
 Our interpretation of Midcal is supported by the consideration that that case had nothing to do with the applicability of a state action defense to a private party. Midcal involved an action by a wholesale distributor of wine for a writ of mandate for an injunction against the California Department of Alcoholic Beverage Control--a state agency.[13] Because, as we said earlier, Parker immunity for state defendants does not require compulsion, it makes sense that the Court did not require compulsion of the state Department.[14] Moreover, because the Court's holding against state action immunity in Midcal was grounded on the fact that the second standard, requiring active state supervision, was lacking, it is not surprising that the Court did not articulate a standard designed to encompass every conceivable state action case. The Court's citation to City of Lafayette --a non-private party case--immediately after listing the two standards further evidences that the Court's focus was only on cases involving public defendants. The Supreme Court recently agreed with our reading of this passage, referring to Midcal as having adopted the principle "that anticompetitive restraints engaged in by state municipalities or subdivisions must be 'clearly articulated and affirmatively expressed as state policy' in order to gain an antitrust exemption. Midcal, 435 U.S. at 105 [100 S.Ct. at 943]." Community Communications Co., 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14 (emphasis added). The fact remains that the only two state action cases in the Supreme Court to date involving private defendants have applied the threshold compulsion requirement.[15]
 
 
 14
 Appellants suggest that their view of the state action doctrine does not really constitute a significant change from prior law, arguing that Goldfarb would have come out the same way under their reading of Midcal because in Goldfarb the minimum fee schedule lacked even state authorization. Such speculation, however, ignores the fact that the Supreme Court in Goldfarb could not possibly have been more clear in imposing a compulsion requirement on private parties. The very basis of the Court's holding was that compulsion was lacking; having made that determination, the Court reached no other issues, including whether the state had authorized the bar association's action. More importantly, reading a compulsion requirement out of the private party state action doctrine would require a complete reformulation of the theoretical foundations for state action first established in Parker. Under the view of federalism espoused in Parker and followed in Goldfarb and Cantor, the Court's inquiry focuses on the wording and intent of the Sherman Act in determining whether private action is mere obedience to a state command and therefore effectively the action of the state itself. Under appellants' view of federalism, on the other hand, Congress' explicit legislative determination to reach the conduct of "individuals and corporations" may be overridden by a state's decision to implement a voluntary supervision scheme that permits but does not compel anticompetitive behavior.[16] Even if such a view of federal-state relations could be supported, its adoption would require at least some explanation or discussion. In Midcal there was none. Additionally, appellants' view of state action for private parties would raise extremely difficult practical questions of interpretation and application. For example, appellants presumably do not dispute the continued validity of the Court's statement in Cantor in 1976 that state authorization, approval, encouragement, or participation in restrictive private conduct does not confer antitrust immunity. See 428 U.S. at 592-93, 96 S.Ct. at 3118-3119. Yet appellants' interpretation of Midcal would have us find antitrust immunity where a state grants private parties the option of participating in a scheme of state supervision. If there is a significant difference between these two schemes, it eludes us. Thus, in light of the significant theoretical and practical difficulties that a reformulation in state action doctrine would create, we are not inclined to infer such a reformulation from a Supreme Court opinion which is completely silent on the subject.
 
 
 15
 The final reason why we conclude that Midcal does not represent a rejection of a compulsion requirement for private parties is found in the language of the opinion itself. The Court chose to cite Goldfarb with approval, and even quoted from it to the effect that "[i]t is not enough that ... anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." 445 U.S. at 104, 100 S.Ct. at 943 (quoting 421 U.S. at 791, 95 S.Ct. at 2015) (emphasis added). Moreover, in a footnote immediately after setting out the two standards for state action immunity applicable to that case, the Court cited a student note in which the only argument contained at the cited page was that private action must be compelled by the state in order for the private party to invoke state action immunity.[17]
 
 
 16
 In addition to arguing that Midcal represents a rejection of a compulsion requirement for private parties, appellants also rely on various policy arguments against affirming the judgment of the district court. Even if we were not bound by the Supreme Court's decisions in Goldfarb and Cantor, we would find these arguments unpersuasive.
 
 
 17
 Appellants argue first that competition is undermined by a state action requirement that allows states to eliminate competition completely but not to maintain a policy that gives parties the choice of whether or not to compete. But the rationale of the state action doctrine is federalism, not the maximization of competition. As we stated earlier, it is the source of the decision not to compete--not the extent of competition--which determines whether state action exists.[18] Unless it is the state rather than the individual or corporation that decides to act anticompetitively, a state action defense would be inconsistent with the wording and intent of the Sherman Act.
 
 
 18
 Appellants also urge that if we uphold the injunction against collective ratemaking and require competition among carriers, carriers will face the burden of additional expense in preparing individual rate filings. They also assert that the ability of state regulators to perform their task will be undermined. Even if these assertions were supported in the record,[19] they would be irrelevant to proper antitrust analysis. Appellants' objections amount to the argument that competition does not work well, so the antitrust laws should not apply. This argument has consistently been rejected by the Supreme Court. See National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 220-22, 60 S.Ct. 811, 842-843, 84 L.Ed. 1129 (1940). Moreover, if collective ratemaking is as desirable as appellants insist, then it should be but a small step for the states to compel it of all carriers. This latter point underscores a critical element of the state action issue. Congress has instructed courts not to treat lightly overt collusion by private parties in setting prices. Permitting states to confer antitrust immunity on private parties who voluntarily elect state regulation would, in our view, open the way for the creation of large loopholes in federal antitrust law, loopholes whose contours would be difficult to contain. If a state wishes to displace federal antitrust laws, it should be permitted to do so only if it speaks in the clearest and strongest possible terms--by compelling private parties to submit to its own regulatory system.
 
 
 19
 For the reasons stated above, we conclude that the district court properly decided that appellants were not entitled to claim state action immunity. On application for rehearing en banc appellants suggest no fault with the panel's determination that the Sherman Act was violated or that the Noerr-Pennington doctrine does not apply to the challenged activities. Accordingly, we reinstate that part of the panel opinion dealing with these issues, 672 F.2d 469, 476-81 (5th Cir.1982),[20] and AFFIRM the judgment of the district court.
 
 
 20
 JAMES C. HILL, Circuit Judge, with whom RONEY, R. LANIER ANDERSON, III, and THOMAS A. CLARK, Circuit Judges, join dissenting:
 
 
 21
 Once again, I respectfully dissent from the court's ruling that compulsion is an essential element of state action immunity when a state action defense is raised by a private defendant. I write not to profess great admiration for the existence of a state action exemption to federal antitrust laws, but rather to uphold what the Supreme Court has clearly articulated to be the status of the law in this area. The majority view that the Supreme Court could not possibly have meant what it said in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), seems presumptuous at worst, and unsound policy as it pertains to the facts of this case at best. The Midcal test is clear and explicit. It should not be ignored simply because a different conclusion can be reached by re-examining the same line of cases already analyzed by the Supreme Court. In addition, the arbitrary nature of the compulsion requirement imposed by the majority today will significantly interfere with state trucking regulation. Like the federal government, the states interested in this litigation have adopted a sound program of regulation which embraces both the cost benefits of collective ratemaking and the added measure of competition that is preserved by permitting individual rate submissions. A compulsion requirement, as defined by the court, precludes such regulation--no matter how clearly the state's policy may be expressed and supervised.
 
 
 22
 The principal flaw in the majority's position is not that it misinterprets the line of cases developing the doctrine of state action immunity. The court's analysis leading to its conclusion that compulsion is an essential element of the immunity for a private defendant certainly is plausible. However, the Supreme Court reached a different conclusion after examining the same line of cases, and the structure of the federal court system demands that we adhere to its ruling.
 
 
 23
 After reviewing the state action cases commencing with Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court set forth two standards for determining when the state's involvement is sufficient to justify immunity for the challenged conduct. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Midcal, 445 U.S. at 105, 100 S.Ct. at 943 (citing City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.)). In reaching this conclusion, the Court did not limit its analysis to those cases involving only state defendants, but instead examined all of its major decisions construing the state action exemption. The Court began its analysis by focusing on the state's involvement in the challenged restraint in light of the fact "[t]hat immunity for state regulatory programs is grounded in our federal structure." 445 U.S. at 103, 100 S.Ct. at 942. Parker, it argued, "found in the Sherman Act no purpose to nullify state powers. Because the Act is directed against 'individual and not state action,' ... state regulatory programs could not violate it." Midcal, 445 U.S. at 104, 100 S.Ct. at 942 (construing Parker, 317 U.S. at 352, 63 S.Ct. at 314).
 
 
 24
 Using Parker as its foundation, the Court went on to evaluate several recent decisions applying Parker's analysis. The line of cases discussed in this portion of Midcal include those involving private defendants, Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), as well as those involving governmental defendants, Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) and New Motor Vehicle Board v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978). After discussing each of these cases, a unanimous Court concluded that "[t]hese decisions establish two standards for antitrust immunity under Parker v. Brown," and proceeded to enunciate the two-part test set forth above. 445 U.S. at 105, 100 S.Ct. at 943. The Court did not purport to restrict application of its test to governmental entities; nor did it purport to derive the substance of its test from those cases involving governmental defendants. Indeed, as evidenced by the facts of the present case, to have drawn such a distinction on the basis of the identity of the defendant would have proven unreasonable and inconsistent with the federalism concerns underlying the doctrine.
 
 
 25
 When a state enacts a regulatory scheme characterized by a clearly articulated state policy and active and effective supervision over implementation of that policy, but its policy is that of permissive joint ratemaking, the state's policy will be undermined whether governmental entities or private participants are the subject of the lawsuit; few private companies will be foolish enough to participate in valid and constructive state programs when such participation is clouded by the threat of antitrust liability.[1] As Justice Stewart noted in Cantor,
 
 
 26
 If Parker v. Brown ... could be circumvented by the simple expedient of suing the private party against whom the State's "anticompetitive" command runs, then that holding would become an empty formalism, standing for little more than the proposition that Porter Brown sued the wrong parties.
 
 
 27
 Cantor, 428 U.S. at 616-17 n. 4, 96 S.Ct. at 3130 n. 4 (Stewart, J., dissenting). Cf. id. at 604, 96 S.Ct. at 3124 (Burger, C.J., concurring) (for Parker purposes, focus should be "on the challenged activity, not upon the identity of the parties to the suit."); City of Lafayette, 435 U.S. at 420, 98 S.Ct. at 1140 (Burger, C.J., concurring in part and dissenting in part) (same). "The Parker state action exemption reflects Congress' intention to embody in the Sherman Act the federalism principal that States possess a significant measure of sovereignty under our Constitution." Community Communications Co. v. City of Boulder, 455 U.S. 40, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982); see also Parker, 317 U.S. at 351, 63 S.Ct. at 313-314.[2] That sovereignty is subverted when federal law prohibits private companies from participating in well-developed and actively supervised state programs.
 
 
 28
 Unlike an arbitrary compulsion requirement, the Midcal test affords states greater flexibility in the formation of constructive regulatory programs so long as the state clearly and affirmatively expresses its intent to do so and remains continuously and actively involved. Midcal demands a very high degree of state involvement before state action immunity may be claimed. The Court did not purport to expand application of the doctrine, or to overrule Goldfarb. Instead, Midcal simply clarifies that the focus for immunity purposes should be upon the extent of the state's involvement in the challenged activity--that is upon the kind of imprint of state authority the anti-competitive activity bears. Compulsion certainly remains a relevant factor in this determination. Indeed, it is the best evidence that a challenged restraint is a "clearly articulated and affirmatively expressed" state policy. As Professor Areeda has observed, after Midcal, "literal compulsion is powerful evidence, if not determinative, of the existence of state policy, but is neither necessary nor sufficient for Parker immunity." P. Areeda, Antitrust Law p 212.5 at 62 (Supp.1982); see also Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 823 n. 8 (9th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). See generally M. Handler, Reforming Antitrust Laws 6465 (1982); Page, Antitrust, Federalism, and the Regulatory Process: A Reconstruction and Critique of the State Action Exemption After Midcal Aluminum, 61 B.U.L.Rev. 1099, 1122 n. 141 (1981).
 
 
 29
 Nevertheless, the majority insists that compulsion must be the litmus test for the first prong of Midcal for a nongovernmental defendant. It relies primarily upon the fact that Midcal did not expressly overrule the compulsion language in Goldfarb. Admittedly, Goldfarb does suggest that as the state action exemption was developing the Supreme Court anticipated that some type of compulsion might be incorporated into the doctrine.[3] The Court's early references to compulsion, however, were ill-defined and were not restricted to cases involving private defendants. As noted in footnote ten of the majority's opinion, compulsion was discussed in both Bates and Parker wherein governmental defendants were the subject of antitrust scrutiny. Scholars and lower courts also were uncertain about the nature of the compulsion requirement and whether it was a requirement at all.[4] In Midcal, however, the Supreme Court reviewed its earlier treatment of compulsion, and concluded that the state action doctrine had developed to the point where a single test could provide the necessary analysis and satisfy the concerns articulated in Goldfarb. Thus, as the Ninth Circuit already has observed, "It appears that the statement in Goldfarb regarding compulsion refers to a combination of the criteria that there be both a clear articulation of state policy and active supervision by the state itself. 421 U.S. at 788-91, 95 S.Ct. at 2013-2015." Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 823 n. 8 (9th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 2038, 73 L.Ed.2d 1308 (1982).
 
 
 30
 Clearly, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Parker, 317 U.S. at 351, 63 S.Ct. at 314. The Court in Midcal recognized this limitation on state action immunity, 445 U.S. at 106, 100 S.Ct. at 943-944, and thus formulated a test which examines the extent of the state's involvement at two levels--first, at the level of articulation of state policy in favor of the challenged restraint and second, at the level of implementation of that policy through active supervision. Significant involvement at both levels is necessary to support a state action exemption. And it is the combination of these two criteria that effectively guarantees that the state has considered the course of its conduct and has chosen to replace open market pricing with state regulation. Hence, the balance struck in Midcal between the federal policy of competition and state sovereignty is thus: the state may choose to displace competition with economic regulation by making clear its intention to do so; having made that choice, however, the state bears the burden of ensuring that this policy is furthered and that the state itself remains the ultimate decision maker.
 
 
 31
 The Court's recent decision of Community Communications Co. v. City of Boulder, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), amply illustrates the degree of directness and clarity necessary to satisfy the first prong of Midcal. In Boulder, the Court ruled that because the State's constitutional delegation of home rule authority to municipalities was not a "clear articulation and affirmative expression" of state policy in the area of cable television, a city's cable television moratorium was not afforded state action immunity. 102 S.Ct. at 843. In other words, when a home rule provision was added to Colorado's constitution, the state could not foresee that it was expressly authorizing a cable television moratorium. Boulder therefore can be fairly read to stand for the proposition that the state must be fully aware of what it is doing when it articulates and affirmatively expresses its policy to supplant open market competition. Boulder also is significant because a majority of the Court appears to have ruled that "a municipality may invoke the Parker doctrine only to the same extent as can a private litigant." 102 S.Ct. at 850 (Rehnquist, J., dissenting); accord M. Handler, supra, at 64 ("Boulder, however, indicates that municipalities enjoy no more liberal a standard of immunity than private parties.").
 
 
 32
 The majority, however, would adhere to the position that the only way a state can articulate a clear and express policy (when a private defendant is sued) is by compelling all carriers to engage in collective ratemaking. Thus, the court maintains that if a motor carrier is permitted to join in the development and submission of joint rates through the bureaus, at its election, such a program cannot be a clearly and affirmatively expressed state policy. Initially, it seems clear that a state can articulate clearly a policy which incorporates both the benefits of joint ratemaking and separate filings. Indeed, such a policy of permissive joint ratemaking may be far superior to the complete mandatory joint ratemaking suggested by the majority. As the district court suggested, rate bureaus provide important support services to state regulatory bodies such as the staff experts and facilities necessary to collate data for the preparation of cost studies. See United States v. Southern Motor Carriers Rate Conference, Inc., 467 F.Supp. 471, 476 (N.D.Ga.1979). See generally H.R.Rep. No. 1100, 80th Cong., 1st Sess. (1947). However, individual rate submissions also provide an important check on rate bureaus and preserve a certain degree of competition. For example, if an individual rate submission is significantly lower than a bureau rate proposal, the regulatory body is alerted to possible abuse of the privilege of collective ratemaking, and is better able to enforce and supervise its program than if there is no possibility of an individual rate proposal.
 
 
 33
 The irony of this litigation is that the Government seeks to enjoin states from implementing a transportation policy which parallels our national transportation policy. Federal law regulating interstate motor carriers adopts a policy of permissive joint ratemaking, and if a carrier chooses to participate in government approved collective ratemaking it is expressly exempt from antitrust liability. 49 U.S.C.A. Sec. 10706(b)(2) (West Supp.1982), former 49 U.S.C.A. Sec. 5(b) (1959). Drafters of the original federal exemption for collective interstate ratemaking, upon which North Carolina's law is modeled, stated the following with respect to the conflict between the antitrust laws and national transportation policy:
 
 
 34
 It is recognized by all who are familiar with the problems of transportation that the carriers subject to the Interstate Commerce Act cannot satisfactorily meet their duties and responsibilities thereunder and the basic purposes of the Act cannot be effectively carried out, unless such carriers are permitted to engage in joint activities to a substantial extent.... It is obvious that confusion and uncertainty are inevitable where these two principles of public policy [antitrust laws and national transportation policy], administered and enforced by different agencies, are applied in such a way that there is conflict between them.
 
 
 35
 H.Rep. No. 1100, 80th Cong., 1st Sess. 4-5 (1947); S.Rep. No. 44, 80th Cong., 1st Sess. 3-4 (1947). Although there have been modifications of the statutory exemption for interstate carriers engaged in collective ratemaking, and there are those who would disagree with the current status of the federal regulatory framework, few would seriously argue that the federal government had not clearly articulated and affirmatively expressed a national transportation policy of permissive joint ratemaking.
 
 
 36
 Further evidence of an articulation of state policy is the fact that all rates are closely supervised by the state.[5] This also illustrates the importance of satisfying both prongs of the Midcal test, for together they satisfy the function served by the Goldfarb formulation. The active supervision requirement is essential to the Midcal test because it inhibits the influence of economic self interest of the companies involved in the rate setting process. Such private self interest does not warrant the cloak of state action immunity. But, by requiring that a state actively supervise implementation of its economic policy, the Midcal test ensures that the state has determined that the challenged activity is in furtherance of the state's policy. When the state ceases to be the real party in interest, the sovereignty of the state cannot be said to be impaired by withholding state action immunity.[6] But when the state is the real party in interest, its continuous and active supervision evidences its intent to impose state regulation in lieu of open market competition, and withholding antitrust immunity does impair state sovereignty.
 
 
 37
 Because it is the requirement of active supervision which deters abuse of joint ratemaking procedures, if any distinction is to be drawn between public and private defendants, it should be in the amount of supervision deemed necessary to satisfy this portion of the Midcal test. It makes no sense to require compulsion for private and not public defendants when in both instances the same state policy will be thwarted by the threat of antitrust liability. Looking to the degree of active supervision, on the other hand, may be more relevant in a suit against a private defendant because it is possible that abuse of the state system may be an issue.[7] Nevertheless, because the Government does not challenge the adequacy of any state's supervision in the present case, there is no reason to draw this distinction.
 
 
 38
 The only issue in this case, therefore, is whether the individual states involved clearly articulated and affirmatively expressed state policy in favor of permissive ratemaking. As set forth in my original dissent, I think it clear that the states of North Carolina, Tennessee and Georgia have such a policy. Nevertheless, because the district court entered a final judgment before the Supreme Court's pronouncements in Midcal, I would remand the case for further development of the factual record and for evaluation under the Midcal test.
 
 
 39
 THOMAS A. CLARK, Circuit Judge, with whom RONEY, Circuit Judge, joins dissenting:
 
 
 40
 I concur in Judge Hill's dissent and his thorough analysis of Midcal which demonstrates that compulsion is not a prerequisite for application of the state action exception.
 
 
 41
 Differing interpretations of Supreme Court opinions are not uncommon. What disturbs me so deeply about the majority opinion is that it completely ignores the Interstate Commerce Act, public policy, history, and fairness. As pointed out by Judge Hill, the functions of rate bureaus or conferences declared illegal by the majority have been accepted national policy for more than thirty years. These same defendants have performed the identical functions[1] for interstate carriers whose rates are fixed by the Interstate Commerce Commission. These functions, when performed by these bureaus for interstate carriers are exempted from the Antitrust Act by the Interstate Commerce Act:
 
 
 42
 As provided by this subsection, a motor common carrier of property providing transportation or service subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title may enter into an agreement with one or more such carriers concerning rates (including charges between carriers and compensation paid or received for the use of facilities and equipment), allowances, classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, or establishment of them.... If the Commission approves the agreement, it may be made and carried out under its terms and under the conditions required by the Commission, and the antitrust laws, as defined in the first section of the Clayton Act (15 U.S.C. 12), do not apply to parties and other persons with respect to making or carrying out the agreement.
 
 
 43
 49 U.S.C.A. Sec. 10706(b)(2).
 
 
 44
 The states involved here likewise permit joint filings of rates by carriers through the medium of a bureau or conference, and permit individual carriers to file their own rates. Thus, not all carriers are compelled to file rates through a conference or bureau. The majority holds that if a state compelled uniform action by the carriers, such a state statute would meet the Parker v. Brown requirement of state action and joint action would be exempt from the antitrust statute. Again, I turn to the Interstate Commerce Act and find that the national act forbids exclusive rate-fixing in the following manner:
 
 
 45
 (2) The Commission may not approve an agreement under this section--
 
 
 46
 * * *
 
 
 47
 * * *
 
 
 48
 (C) establishing a procedure for determination of a matter through joint consideration unless the Commission finds that each party to the agreement has the absolute right under it to take independent action before or after a determination is made under that procedure.
 
 
 49
 49 U.S.C.A. Sec. 10706(d)(2). Thus, as can be seen, the Commission does not compel carriers to participate in the agreement. The state statutes are patterned very much after the national act, permitting joint action through the bureaus and conferences, but also permitting individual action.
 
 
 50
 By way of hypothecation, Southern Motor Carriers Rate Conference, Inc. may file with the Interstate Commerce Commission rates for the carriage of carpeting from Rome, Georgia, to Nashville, Tennessee. That same Conference may perform the identical function for the intrastate carriage of carpeting from Rome to Macon, Georgia, approximately the same distance. This has been done for three decades prior to the filing of this action in 1976. It is patently unfair at this late date to declare that these defendants violated the antitrust act when following identical procedures that are not violative of the antitrust act when done in interstate commerce.
 
 
 
 *
 Former Fifth Circuit case (Section 9(3) of Public Law 96-452--October 14, 1980)
 
 
 [1]
 For further elaboration of the facts regarding the role of the rate bureaus, their relationship with the state regulatory commissions, and the general pattern of regulatory procedures in the five subject states, see the district court's carefully written opinion. United States v. Southern Motor Carriers Rate Conference, Inc., 467 F.Supp. 471, 476-78 (N.D.Ga.1979)
 
 
 [2]
 In the district court, the state attorneys general of the states of Alabama, Georgia, Mississippi, North Carolina, and Tennessee participated as amici curiae. The National Association of Regulatory Utility Commissioners (NARUC) also was allowed to participate as an intervenor
 
 
 [3]
 Appellants seek to characterize Parker as a case in which individual growers were not compelled to act anticompetitively, citing a provision of the program which permitted growers to set aside up to 30% of their crops for sale on the free market. The 30% set-aside provision, however, did not affect the ability of a grower to elect not to participate as to the remaining 70% of his crops. In this sense, the state mandated the participation of every grower and compelled the challenged anticompetitive behavior
 
 
 [4]
 Significantly, this reference to federalism concerns was directed not to any limitation on Congress' power to act; instead, it was stated merely as a rule of statutory interpretation--that is, whether and to what extent Congress had chosen to override existing state regulation
 
 
 [5]
 The State Bar was, for "some limited purposes," a state agency. 421 U.S. at 791, 95 S.Ct. at 2015. But because the fee schedule itself was published by the county bar association, we agree with those who characterize Goldfarb as an action against a private party. Cf. Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (antitrust claims raised only against state bar, which was a state defendant)
 
 
 [6]
 In determining whether compulsion is present, we do not believe that private parties may have no role in proposing mandatory state action. In Parker and New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1979), the Supreme Court made it clear that an action still may be compelled by the state even though private parties petitioned the state to consider requiring such action. See also California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In Cantor, formal compulsion was present despite the fact that Detroit Edison could with little difficulty have petitioned the state commission for discontinuance of the program which the company itself had proposed. Thus, by compulsion we mean something less than that envisioned by some commentators. See e.g., 1 P. Areeda & D. Turner, Antitrust Law p 215 (1978). Still, once a state has adopted some policy, whether or not after a petition by a private party, private parties will be exempt from the antitrust laws only if the state requires some action pursuant to that policy
 
 
 [7]
 In a prior part of the opinion (Part II) Justice Stevens, joined only by three other members of the Court, concluded that Parker should be limited to suits against state officials
 
 
 [8]
 The disagreement in the Court centered on what in addition to compulsion was required for state action immunity for private parties. In fact, Justice Stewart, joined by Justices Powell and Rehnquist, argued that Michigan's decision to adopt Detroit Edison's proposal and then compel compliance with it should have been by itself sufficient for state action immunity
 
 
 [9]
 Another rationale for the compulsion requirement is that if a private party is permitted by the state to make the choice whether or not to compete, there is no necessary conflict between state and federal law because the private party may comply with both federal and state law at the same time
 
 
 [10]
 We acknowledge that Bates and Parker, which involved state defendants, discussed the presence of compulsion, but we view those cases--as appellants would have us do--as instances in which the presence of compulsion provides the best evidence of clear articulation and affirmative expression of state policy to displace competition
 
 
 [11]
 The district court found that "regardless of the virtual romance between the states and the ratemaking conferences, no state requires that rates be published collectively." 467 F.Supp. at 483 (emphasis in original). An analysis of each state's policies reveals the correctness of the district court's finding. North Carolina General Statute Sec. 62-152.1(b) states that in order to realize and effectuate the policy of uniform rates among carriers, any party to an agreement with other carriers regarding uniform rates may apply to a state commission for approval of the agreement; Section 62-152.1(h) relieves parties to an agreement so approved from the operation of the antitrust laws. The statute does no more than authorize or permit collective ratemaking. There is no compulsion. Tennessee Public Service Commission Rule 1220-2-1.40 adopts Section 5a of the Interstate Commerce Act, 49 U.S.C.A. Sec. 10706(b), which permits carriers to file joint rates and exempts those who do file such rates from the antitrust laws. In addition, Tenn.Code Ann. Sec. 65-1506 permits the Public Service Commission to establish joint ratemaking procedures. Again, there is no state compulsion. Georgia Code Ann. Sec. 68-613, which requires a state commission to "establish ratemaking procedures for all motor common carriers, which procedure shall include, but not be limited to, collective ratemaking procedures," explicitly indicates that Georgia intends to give carriers the option of filing rates jointly or individually. The State of Georgia, participating as amicus in the district court, presented a 1942 order issued by its public service commission stating that "all for hire motor common carriers operating under Class A certificates be, and they are hereby, directed and required to publish and file with this Commission ... a tariff containing all local and joint class and/or commodity rates applicable between points within Georgia." Pointing to the italicized language, the state argued that the commission "clearly directed all Class 'A' carriers to file a single joint tariff with the Commission," thus indicating its policy in favor of collective action. Id. We are not persuaded that the language of the 1942 order is susceptible of only this interpretation. At best it is ambiguous. Given the statute, only recently amended to insert the provisions outlined above, it would not, in any event, be controlling. A 1942 order of the Alabama Public Service Commission requires carriers to "prepare, publish and file with the Commission an individual tariff or ... participate in an agency issue." As with Georgia, Alabama explicitly permits individual rate applications. Finally, Mississippi in Miss.Code Ann. Secs. 77-7-1 to -341 merely contemplates cooperation among carriers to the limited extent of establishing "joint rates." This falls short of compelling joint applications for proposed rates
 
 
 [12]
 The government points out that the district court conducted no fact-finding as to this issue. The record, however, reveals that the state commissions conduct hearings to review the reasonableness of proposed carrier tariffs and routinely suspend their effectiveness
 
 
 [13]
 In the Supreme Court, petitioner California Retail Liquor Dealers Association had appealed the case as an intervenor
 
 
 [14]
 In any event, compulsion was in fact present in Midcal. See 445 U.S. at 100, 100 S.Ct. at 940
 
 
 [15]
 Appellants cite several lower court cases in support of their position, but only two of them actually found that private parties were immune without compulsion by the state. The first, Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority, 475 F.Supp. 711 (D.D.C.1979), aff'd per curiam, No. 79-1658 (D.C.Cir.1980), cert. denied, 450 U.S. 914, 101 S.Ct. 1355, 67 L.Ed.2d 339 (1981), a district court opinion, is of only limited relevance because in that case the court reviewed a governmental restraint involving a private party (and a state defendant) rather than, as here, a private restraint approved by the government. In the second case, Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813 (9th Cir.1982), cert. denied, --- U.S. ----, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982), in which the Ninth Circuit reviewed an antitrust challenge to a private agreement allocating horse racing dates between two race track operators, the state had by statute specifically reserved the right to perform the allocation in the event that the private parties could not agree. Id. at 816. Thus, although the state did not compel the private parties to enter into the racing date agreement, it had effectively ensured that the anticompetitive conduct would occur one way or another
 
 
 [16]
 Appellants reason that the Court eliminated the compulsion requirement because the basis for state compulsion is the concern that the economic self interest of private parties might affect the rate setting process and, according to appellants, the second standard in Midcal--the requirement of state supervision--assuages that concern. They assert that a supervision requirement adequately ensures that the state has determined that the challenged activity is in furtherance of the state's policy and that the state does not abdicate its responsibility to private parties. We disagree with this analysis. If the second Midcal standard accomplished as much as appellants claim, there would have been no need for the first standard. Further, if compulsion and supervision served the same purpose, the Supreme Court would have upheld, rather than denied, state action immunity in Midcal because compulsion was present in that case. See 445 U.S. at 99-100, 100 S.Ct. at 940-941. That the Court did not reach this result is evidence that supervision and compulsion serve different purposes. In our view, both supervision and compulsion are necessary for a finding of state action. A state cannot deprive competitors of their ability to subvert competition merely by compelling them to formulate collective rates. Conversely, active supervision of anticompetitive conduct undertaken at the voluntary election of a private party also is not by itself adequate. For example, a state may by regulation supervise the reasonableness of rates, but the reasonableness of any particular rate may have little to do with whether it was arrived at anticompetitively. A state regulatory system does not even necessarily have the regulatory power to supervise anticompetitive behavior if the resulting rate falls somewhere within the zone of reasonableness. As we stated earlier, compulsion serves an entirely different purpose from supervision: as Goldfarb and Parker established, the compulsion inquiry is to determine whether the specific anticompetitive activity at issue was actually that of the state acting as sovereign
 
 
 [17]
 The mere fact that anticompetitive conduct by a private party effectuates a clearly articulated state regulatory policy is not in itself sufficient to justify a state action defense against injunctive relief. The defense is only available if the state has elected to effectuate its policy by requiring the private conduct under attack
 Note, Parker v. Brown Revisited: The State Action Doctrine After Goldfarb, Cantor and Bates, 77 Colum.L.Rev. 898, 916 (1977) (emphasis in original). The Note, at the end of the relevant section, was even more definite: "To summarize, a state action defense against injunctive relief should be available for private conduct only if the state has specifically required the conduct in question without abdicating final decisionmaking authority to private parties." Id. at 918.
 The same footnote in the Midcal opinion also cited Norman's on the Waterfront, Inc. v. Wheatley, 444 F.2d 1011, 1018 (3d Cir.1971), and Asheville Tobacco Bd. v. FTC, 263 F.2d 502, 509-10 (4th Cir.1959), in which state action defenses were refused. Although both cases are ambiguous as to the requirements for state action, neither one implies that compulsion is not necessary for private parties.
 
 
 [18]
 Thus, a state may exempt a specific subclass of carriers from regulation or, as in Parker, it may predetermine a set amount or type of activity that may remain in the free market. In both of these cases, the state controls and sets the terms of the individual decision as to whether to compete. But where the option to compete or join a system of state regulation at all is up to the private party, state action does not exist
 
 
 [19]
 We note that the government did not seek to enjoin the rate bureaus from performing joint rate studies or from undertaking joint publication of individual rates and agreements involving two or more parties who provide joint service
 
 
 [20]
 We also agree with the panel's determination that there is no implied immunity from the antitrust laws resulting from the antitrust exemption granted motor carriers under 49 U.S.C.A. Sec. 10706, or from the existence of pervasive state regulation permitted by 49 U.S.C.A. Sec. 10521(b). See 672 F.2d at 475 n. 9
 
 
 [1]
 There may be substantive limits on what conduct the state may immunize by making the challenged restraint a state policy. Indeed, there is some suggestion in Supreme Court precedent that federal antitrust laws do place substantive limits on the content of state economic regulation. See, e.g., Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (invalidating a Louisiana fair trade statute containing a "non-signer" provision under which a retailer could be enjoined from knowingly underselling another retailer whose prices were set under a resale price maintenance contract, exempt from antitrust laws under the Miller-Tydings Act, with a supplier). But see P. Areeda & D. Turner, Antitrust Law p 212 at 70 (1978) (interpreting this decision as an inadequate supervision case). See generally Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 N.Y.U.L.Rev. 693 (1974). These limits may be reached in areas that have not been traditionally regulated by states
 Here, however, the states are involved in a type of private utility regulation. The ability to regulate motor carriers involved in intrastate activities not only is a traditional state regulatory function, but also is an authority reserved to the states by the Congress. 49 U.S.C.A. Sec. 10521(b) (West Supp.1982).
 
 
 [2]
 In Parker the Court concluded that "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." 317 U.S. at 351, 63 S.Ct. at 313. The state action doctrine therefore was developed to effectuate Congressional intent that state restraints on competition would not be prohibited. However, "[t]here is nothing to indicate that the Congress of 1890 intended to leave state-compelled restraints intact but to subject state-authorized restraints to antitrust." M. Handler, Reforming Antitrust Laws 64-65 (1982)
 
 
 [3]
 At least one commentator has suggested that "[t]he compulsion requirement was an overreaction to the facts presented in Goldfarb, where the conduct challenged was actually contrary to the pronouncements of the state, and in Cantor, where the state agency never addressed the practice involved in any meaningful manner." M. Handler, supra at 64. Professor Areeda also agrees with this assessment:
 Indeed, Goldfarb and Cantor may be readily explained as decisions resting not on the absence of compulsion, but rather on the absence of any sort of meaningful state participation in the challenged conduct. In Goldfarb, the defendants were private groups enforcing fee schedules without adequate state authority or supervision. The essence of Cantor was the state's presumed indifference to the utility's "free" light bulb program; state approval, even if deliberate, was not intended to displace the antitrust laws.
 Areeda, Antitrust Immunity for "State Action" After LaFayette, 95 Harv.L.Rev. 435, 439 n. 19 (1981).
 
 
 [4]
 Prior to Midcal, Professors Areeda and Turner observed that the precise meaning of the compulsion test and its role in determining immunity was left unclear by Goldfarb and Cantor. 1 P. Areeda & D. Turner, Antitrust Law p 215 at 93 (1978); accord Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority, 475 F.Supp. 711, 724-25 (D.D.C.1979). Thus, they proposed that two requirements were essential to sustain a defense of state action immunity: "(1) adequate public supervision and (2) a clear state purpose to displace antitrust law." Areeda & Turner, supra, p 212 at 71. The similarity between this proposal and the test eventually adopted in Midcal suggests that the Court perceived the reasonableness of dropping its earlier compulsion language and adopting a simple and clear rule of general applicability
 
 
 [5]
 While we treat these as separate requirements, we nevertheless want to stress their interrelationship. The existence of state supervision over anticompetitive behavior may, for example, indicate the requisite state intent as well. Similarly, inaction on the part of the state may both represent a failure of supervision and reflect an ambiguous state purpose
 
 
 [1]
 P. Areeda & D. Turner, Antitrust Law p 212 at 71 (1978)
 
 
 [6]
 The existence of a state action immunity enables states, like the federal government itself, to define areas inappropriate for market control. Moreover, the adequate supervision criterion ensures that state-federal conflict will be avoided in those areas in which the state has demonstrated its commitment to a program through its exercise of regulatory oversight. At the same time, it guarantees that when the Sherman Act is set aside, private firms are not left to their own devices. Rather, immunity will be granted only when the state has substituted its own supervision for the economic constraints of the competitive market
 
 
 [1]
 P. Areeda & D. Turner, Antitrust Law p 213 at 73 (1978) (footnotes omitted)
 
 
 [7]
 Professor Areeda has even suggested that Midcal 's active supervision requirement may be inapplicable to governmental defendants. Areeda, Antitrust Immunity for "State Action" After Lafayette, 95 Harv.L.Rev. 435, 445 n. 50 (1981) ("A few courts erroneously appear to use the Midcal formula (clearly articulated state policy plus active supervision of private parties) to require state supervision of governmental defendants.") In Community Communications Co. v. City of Boulder, however, the Supreme Court expressly declined to decide whether the active supervision criterion must be met by a municipality with respect to the challenged ordinance. 102 S.Ct. 835, 841 n. 14 (1982)
 
 
 [1]
 Described in the majority opinion, at 534